## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| ACG Credit Company II, LLC, | Case No. 14-11500 (KJC) |
| Debtor. | Hearing Date:  July 29, 2014 at 11:00 a.m.<br>Obj. Deadline:  July 24, 2014 at 4:00 p.m.<br>Related to Docket Nos. 54 |

### SAGECREST II, LLC'S OBJECTION TO THE DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING AND APPROVING THE EMPLOYMENT OF EXECUTIVE SOUNDING BOARD ASSOCIATES LLC AS CHIEF RESTRUCTURING OFFICER FOR THE DEBTOR *NUNC PRO TUNC* TO JUNE 25, 2014

John D. Huber, as Trustee of the SageCrest Liquidating Trust ("SageCrest"),[1] by and through its undersigned counsel, submits this objection (the "Objection") to the application (the "Application") by ACG Credit Company II, LLC (the "Debtor") for entry of an order authorizing the Debtor to employ Executive Sounding Board Associates LLC ("ESBA") as its Chief Restructuring Officer ("CRO"), effective *nunc pro tunc* to June 25, 2014.

In the month since this case was commenced on June 17, 2014 (the "Petition Date"), the Debtor has failed to provide any substantive disclosures regarding its purported assets or its supposed plan for reorganization.  The Debtor has failed to do so because doing so would spotlight how it is at the tail end of its liquidation and has no business to reorganize.  As Ian Peck, the Debtor's principal, testified in two consolidated actions pending in the United States District Court for the District of Connecticut (Bridgeport) entitled *SageCrest II, LLC v. ACG*

---

[1]    SageCrest is the successor-in-interest to SageCrest II, LLC, a former lender of the Debtor.  Upon SageCrest II, LLC's own bankruptcy and reorganization, all of the assets of SageCrest II, LLC (and others) were assigned to the SageCrest Liquidating Trust in accordance with the terms of a Plan of Reorganization.  As used herein, the term "SageCrest" includes Mr. Huber in his capacity as Trustee, the SageCrest Liquidating Trust, and SageCrest II, LLC.

*Credit Company II, LLC, et al.*, 3:13-CV-973 (SRU), and *SageCrest II, LLC v. Ian S. Peck*, et al.

3:12-CV-974 (SRV) (collectively, the "Connecticut Action"),[2] the Debtor's only business is

collecting on loans related to the May 19, 2008, Settlement Stipulation and Mutual Release

(the "So-Ordered Settlement Stipulation") between the Debtor and SageCrest.  SageCrest has

been embroiled in litigation with the Debtor, Ian Peck and certain other related companies for

approximately six years due to, *inter alia*, their failure to pay millions of dollars pursuant to the

So-Ordered Settlement Stipulation.  Extensive discovery has revealed that the remaining loans,

and the collateral underlying them, have been liquidating over the past several years and the

liquidation is now at the end of its economic life.  The remaining value of the loan-related assets

is insufficient to pay the professionals the Debtor has proposed to engage in this case.  As

Schedule F of the Debtor's Schedules of Assets and Liabilities (the "Schedules") demonstrates,

the Debtor has a history of running up large professional bills that it cannot pay and appears to be

doing it again here.  The Debtor only has seven creditors and of that seven, four are professional

firms owed unpaid fees, two are insiders, and one is SageCrest.  The Debtor therefore has no

material assets left or ongoing business to reorganize.

The limited disclosure that the Debtor has provided in this action bears this out.

Schedule F makes clear that the only claims to be resolved in this bankruptcy are related to:  the

Debtor and SageCrest's claims under the So-Ordered Settlement Stipulation, debts purportedly

owed to insider creditors, and professional fees—the vast majority of which were incurred in

connection with the claims between the Debtor and SageCrest.  SageCrest opposes the retention

because it is the largest non-insider creditor of the Debtor, and the Debtor has insufficient assets

---

[2]     Filings in the Connecticut Action are consolidated under case number 3:13-CV-973
(SRU).

to pay the mounting array of professionals the Debtor has asked to employ. The Debtor is no longer making loans, is at the final stages of liquidating the last of its loan-related assets, is relying solely on its success in litigation to fund this chapter 11 case, has made no showing that it has any business to restructure, and has failed to make the disclosures it is required to make under the Bankruptcy Code. Under these circumstances, authorizing the Debtor's employment of a CRO would only serve to further deplete the Debtor's assets by incurring needless professional fees, and the Debtor's Application should be denied. The role of the proposed CRO would be better served by a chapter 7 trustee.[3]

## BACKGROUND

1.    Pursuant to the So-Ordered Settlement Stipulation, the Debtor was required to pay SageCrest $11,125,000. (Exhibit A.)[4]  The Debtor failed to do so. SageCrest commenced two separate actions with respect to the Debtor's failure to meet its obligations under the So-Ordered

---

[3]    SageCrest reserves the right to seek to convert this case to a case under chapter 7. Moreover, as set forth in the Stay Motion, SageCrest reserves the right to challenge whether the Debtor's bankruptcy case should be dismissed as being filed in bad faith and because no reorganization is possible, among other grounds. There is substantial evidence that indicates that the Debtor's bankruptcy filing was done in bad faith, including: the Debtor has so few creditors, the filing was made only a few hours before trial in the Connecticut Action, the Debtor has failed to make the financial and other disclosures required by the Bankruptcy Code this Court's local rules, this is the second time Defendants' have resorted to an eve of trial filing to adjourn a firm trial date, the Defendants have systematically sought to delay adjudication of the claims in the Connecticut Action for more than five years, the Debtor cannot confirm a plan over SageCrest's rejecting vote given the number and amount of the creditors' claims, and the Debtor cannot articulate a bona fide reorganizational purpose or prospect in this chapter 11 case, which is nothing more than a two-party dispute. *See, e.g., See Santa Fe Mineral, Inc. v. Bebco, L.P. (In re 15375 Memorial Corp.)*, 589 F.3d 605, 618-19 (3d Cir. 2009) (citing *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 119-20 (3d Cir. 2004)); *In re SGL Carbon Corporation*, 200 F.3d 154, 165 (3d Cir. 1999).

[4]    Annexed hereto as Exhibit A is a true and correct copy of the So-Ordered Settlement Stipulation without the exhibits annexed thereto.

Settlement Stipulation. Those actions were consolidated before the Connecticut District Court in the Connecticut Action. The Debtor also asserted counterclaims in the Connecticut Action.

      2.      During his May 7, 2014 deposition in the Connecticut Action, Ian Peck, the sole officer of the Debtor, testified that he did not know if the Debtor had an active bank account. (Exhibit B at 244:4-246:3.)[5] Mr. Peck further testified that the Debtor "doesn't do very much business at all, its business is collecting on loans related to the" So-Ordered Settlement Stipulation. (*Id.* at 246:12-17.)

      3.      Proceeds from the few remaining assets under the Debtor's control are pledged to SageCrest pursuant to the So-Ordered Settlement Stipulation. (*See* Exhibit A at §§ 1 and 2(c).) These are the proceeds from and collateral underlying the loans made to Peter Socolof and Vernon Bailey, and a piece of art by Anne Redpath entitled "Still Life." The undisputed evidence from the Connecticut Action demonstrates that the collateral underlying the loan to Mr. Socolof, a set of antique trains, is currently in the Debtor's possession. (Exhibit C.)[6] The Debtor is also in maintains control over the collateral underlying the loan to Mr. Bailey, a painting by George Stubbs entitled "Horse with Jockey Up," which, according to Mr. Peck, is either in storage at one of the Debtor's storage facilities or being held by Christies on consignment. (Exhibit B at 57:20-58:4, 264:19-265:7.) According to Mr. Peck, the collateral underlying the loans to Messrs. Socolof and Bailey are, in his estimation, worthless and/or the Debtor has been

---

[5]      Annexed hereto as Exhibit B is a true and correct copy of excerpts from the transcripts of the November 26, 2013 and May 7, 2014, depositions of Ian Peck.

[6]      Annexed hereto as Exhibit C is a true and correct copy of a March 26, 2009, letter from Ian Peck to Christie's in London authorizing the collection of the antique trains that were used as collateral for Mr. Socolof's loan. Those trans are a George Brown Locomotive with Box and Cars, a Voltamp Special Maroon "Pennsylvania" Passenger Set, a Carette Side Wheeler Boat, and a Bing Gauge I "N.Y. Central Lines" Passenger Set with Box.

unable to sell them.[7] Mr. Peck testified that the Debtor has sent default notices and demand

letters to Messrs. Socolof and Bailey, but have made no additional efforts to recover a the

amounts owed from them. (*Id.* at 62:23-63:14.) The Debtor claims that it has continued to hold

the Redpath piece in a storage facility, but has refused to turn it over to SageCrest. (*Id.* at 50:22-

57:8, 279:23-280:21.)

      4.     The Debtor filed its voluntary chapter 11 petition with this court on June 17,

2014, mere hours before a trial of SageCrest and the Debtor's claims under the So-Ordered

Settlement Stipulation was to begin.

      5.     On June 20, 2014, SageCrest made a motion for relief from the automatic stay to

allow the trial in the Connecticut Action to proceed (the "Stay Motion"). (Dkt. No. 11.) In

connection with the Stay Motion, SageCrest and the Debtor submitted their July 11, 2014,

Stipulated and Uncontested Facts. (Exhibit D; Dkt. No 48.)[8] In those Stipulated and Uncontested

Facts, the Debtor admitted that it did not have any open bank accounts at the time it filed for

bankruptcy relief. (*Id.* at ¶ 44.) The Debtor further admitted that, at the time it filed for

bankruptcy relief, it "was not in the business of making new loans and conducted no business

other than seeking to collect on three loans, a judgment and certain collateral relating to the

So-Ordered Settlement Stipulation." (*Id.* at ¶ 45.) The Stipulated and Uncontested Facts also

corroborated SageCrest's claim that the Debtor's only non-insider creditors are SageCrest and

---

[7]    *See* Exhibit B at 57:9-19 (Mr. Peck testified that after consulting with an expert regarding the value of the Bailey collateral the Debtor "concluded that the piece was not by the artist that we thought it was and was therefore [of] very insignificant value"); 60:12-62:2 (Mr. Peck also claims that the Debtor unsuccessfully attempted to sell the Socolof collateral at auction, and, because of that, the value of the value of the collateral is significantly depressed.)

[8]    Annexed hereto as Exhibit D is a true and correct copy of the July 11, 2014, Stipulated and Uncontested Facts submitted in this action without the exhibits annexed thereto.

five professional firms, all but one of which represented the Debtor in connection with the Connecticut Action. (*Id.* at ¶ 46.)

6.      On July 21, 2014, the Court entered an Interim Order Granting the Stay Motion, which allowed SageCrest to obtain a trial commencement date in the Connecticut and scheduled a final hearing on the Stay Motion for August 27, 2014. (Dkt. No. 79.)

7.      The limited financial disclosures that the Debtor has made in filings in this case further reflect a company that conducted little to no business before it filed for bankruptcy relief. The Debtor's July 2, 2014, Statement of Financial Affairs indicates that the Debtor received only $220,000 since January 1, 2012. (Dkt. No. 35.)  The entirety of that amount is attributable to the Debtor's recovery on a loan from Veronica Hearst that was pledged as collateral for the Debtor's payments under the So-Ordered Settlement Stipulation. (Exhibit A at §§ 1(b), 2(c).).  Irrespective of that pledge and SageCrest's entitlement to the proceeds, the Debtor has apparently spent the majority of that money or has transferred it to insiders.  None of the proceeds were given to SageCrest.

8.      The Schedules also fail to identify any bank accounts the Debtor maintained and fail to identify any particular assets that the Debtor purports to hold. (Dkt. No. 36.)  The Debtor has not supplemented its Schedules.  Yet the Debtor is apparently making payments to its professionals.

9.      The Debtor's monthly operating reports have been similarly devoid of relevant or particularized information, other than the $70,000 in professional fee retainers that have been paid on the Debtor's behalf, including $20,000 that was paid to ESBA. (*See* Dkt. Nos. 39 and 46.)  But there has been no Court order authorizing the post-petition payment of any retainer to

ESBA or any other professional, which fees should only be paid subject to an order of this Court approving a fee application.

10.      In fact, the only additional information of substance contained in those reports is the Debtor's cash flow projection, annexed to its July 9, 2014, Amended Initial Monthly Operating Report, which shows that the Debtor had $100,000 cash on hand at the beginning of this month, projects no cash receipts in the next twelve months, but plans on spending $650,200 during that same time span—mostly on professional fees. (Dkt. No. 46.)

11.      In the Debtor's June 25, 2014, retainer letter with ESBA (the "Retainer Letter"), the Debtor also incurs significant liabilities that may prejudice SageCrest. (Application, Exhibit B.) The Debtor agrees to fully indemnify ESBA, even where ESBA is found to have acted negligently, with respect to any claims for services rendered pursuant to the Retainer Letter. (*Id.* at § 11.) The Retainer Letter also entitles ESBA to bill the Debtor for up to $60,000 per month in professional fees without submitting any timesheets or other contemporaneous records to this Court reflecting that work was performed. (*Id.* at §§ 6 and 22.)

## OBJECTION

12.      SageCrest objects to the retention of ESBA as the Debtor's CRO. As the Debtor admits in the Stipulated and Uncontested Facts submitted in connection with the Stay Motion, at the time this action was commenced, the Debtor did not maintain any bank accounts and conducted no business other than seeking to collect on assets related to the So-Ordered Settlement Stipulation. As the Debtor further admits in its cash flow projection, it does not anticipate receiving any cash over the next twelve months, but plans on spending more than $600,000. The Debtor has filed nothing to date that indicates it has any assets other than those related to the So-Ordered Settlement Stipulation (which SageCrest would be entitled to) and its

claims against SageCrest in the Connecticut Action (which SageCrest believes are unfounded and worthless). If Mr. Peck or the other non-Debtor affiliates have been advancing the retainers to fund the professionals or plan to do so, there has been no mention of any such loans or proposed loans, which would of course require prior Court approval. Under these circumstances, there is nothing for the Debtor to reorganize and allowing the Debtor to retain a CRO serves no purpose other than to deplete estate assets that may otherwise be available to pay SageCrest and any other legitimate creditors.

13.     In fact, SageCrest may already have been prejudiced by the Debtor's retention of a CRO to the extent that the Debtor has used any cash or collateral belonging to SageCrest in order to pay ESBA's retainer. As the Debtor explained in its July 2, 2014, Statement of Financial Affairs, the only income it has received since January 1, 2012 is $220,000 in proceeds received through litigation against Veronica Hearst, which should have been turned over to SageCrest pursuant to the So-Ordered Settlement Stipulation. The cash on hand identified in the Debtor's cash flow projection is attributable to the $220,000 derived from the liquidation of SageCrest's collateral. The Debtor should not be permitted to spend additional funds to retain a CRO, which will likely result in the Debtor's dissipation of even more of SageCrest's collateral.

14.     The Redpath piece, the loans to Messrs. Socolof and Bailey and the underlying collateral are all SageCrest's collateral pursuant to the So-Ordered Settlement Stipulation, and any proceeds from their sale would constitute cash collateral that would be ultimately due to SageCrest. SageCrest opposes the Debtor's use of any of the proceeds from either the Redpath piece or the Socolof and Bailey loans and underlying collateral—either in connection with its proposed retention of ESBA or otherwise—and the Debtor has no means to provide adequate protection to SageCrest to justify its non-consensual use.

8

15.     On July 2, 2014, after the Petition Date, Mr. Peck signed (on behalf of the Debtor) the retainer letter with ESBA. The retainer letter and monthly operating reports filed by the Debtor state that a $20,000 retainer is in the process of being paid to ESBA. (Application, Exhibit B; Dkt. Nos. 39 and 46.) The Debtor has obtained no order from the Court approving the retention of ESBA or authorizing the payment of any post-petition retainers. SageCrest objects to the payment of any such retainer, and, to the extent those funds have already been paid to ESBA by the Debtor, they should be returned immediately.

16.     The Debtor's argument (Application at ¶ 10) that allowing it to retain a CRO "will ensure effective and efficient negotiations and resolutions with SageCrest" ignores the realities of the claims between the Debtor and SageCrest. SageCrest already compromised its claim against the Debtor by agreeing to the So-Ordered Settlement Stipulation, which the Debtor promptly breached. Asking SageCrest to compromise further would be unreasonable, particularly in light of the fact that all claims between the Debtor and SageCrest stand to be resolved in the Connecticut Action after the trial that was stayed by the Debtor's petition in this case is concluded. Until those claims are adjudicated, or the Debtor admits its clear liability under the So-Ordered Settlement Stipulations, a resolution of the claims is extremely unlikely.

17.     To the extent this Court is inclined to permit the Debtor to retain ESBA as its CRO despite the issues discussed above, the Debtor objects to the terms of ESBA's retainer letter. The retainer letter provides a blanket indemnification to ESBA, which includes an indemnification for any negligent conduct by ESBA. Such an indemnification provision incurs substantial liability for the Debtor and may ultimately prejudice the Debtor's creditors. It is also clear that ESBA is not committing to assume the full role of an "officer" of the Debtor under Delaware law. The retainer letter expressly states that: "[n]othing in this agreement is intended

9

to create, shall be construed as creating or be deemed to create a fiduciary relationship between ESBA and [the Debtor]." (Application, Exhibit B at § 2.)  Unless ESBA is making such a commitment and the Debtor can provide directors and officers liability coverage, the section 363 engagement under the terms of the retention letter is completely unwarranted.

While SageCrest acknowledges that under certain circumstances professional firms such as ESBA have been hired under section 363 of the Bankruptcy Code, section 363 is not justified here.  A section 363 engagement of the nature proposed provides an end run around the transparency and scrutiny provided in engagements of professionals under section 327 of the Bankruptcy Code.  In some cases, the expense of a CRO hired under section 363 is dwarfed by the scale of the case.  Not here.  There are virtually no resources to pay the layers of professionals the Debtor is seeking to employ, and virtually all of the remaining assets are subject to SageCrest's security interest.  Heightened, rather than relaxed, scrutiny should thus be implemented in this case.  Allowing ESBA to bill up to $60,000 per month in services in a case of this scale without submitting any time records for approval would needlessly dissipate the Debtor's assets.  In the event the Debtor is permitted to retain ESBA as its CRO, ESBA's fees should be capped and all fees should be subject to any objection by the Debtor's creditors and this Court's approval.

**CONCLUSION**

WHEREFORE, SageCrest respectfully requests that the Debtor's Application for an

order authorizing the Debtor to employ ESBA as its CRO be denied, or, in the alternative, that

the terms of ESBA's engagement be modified to address the issues raised by SageCrest herein,

and that the Court grant such other and further relief as is just and proper.

Dated: July 24, 2014

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: 302-652-3131
Facsimile:  302-652-3117

Laurence May
900 Third Avenue – 16th Floor
New York, NY  10022
Telephone:  212-752-8000
Facsimile: 212-752-8393

- and –

SHEPPARD MULLIN
RICHTER & HAMPTON LLP
Craig A. Wolfe
Robert S. Friedman
Mark E. McGrath
30 Rockefeller Plaza
New York, NY 10112
Telephone:  212-653-8700
Facsimile:  212-653-8701

Counsel for SageCrest